1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK

2
                                        )
3        JOHN HANCOCK LIFE INSURANCE     )    1:21-cv-01540-PKC-TAM
         COMPANY OF NEW YORK,            )    1:23-cv-05945-PKC-TAM
4                                        )
                          Plaintiffs,    )    Brooklyn, NY
5                                        )    January 9, 2024
                          vs.            )
6                                        )
         WILMINGTON SAVINGS FUND         )
7        SOCIETY, FSB, ET AL             )
                                         )
8                         Defendants.    )
                                         )
9                                        )


10                   TRANSCRIPT OF STATUS CONFERENCE
11           BEFORE THE HONORABLE JUDGE TARYN A. MERKL
                  UNITED STATES MAGISTRATE JUDGE

12
         APPEARANCES:
13
         For the Plaintiff:        CAITLIN HICKEY
14                                 JACLYN M. METZINGER
                                   KELLEY DRYE & WARREN LLP
15                                 3 World Trade Center
                                   175 Greenwich Street
16                                 New York, NY 10007

17       For the Plaintiff:        JESUS E. CUZA
                                   REBECCA CANAMERO
18                                 HOLLAND & KNIGHT LLP
                                   701 Brickell Avenue, Suite 3300
19                                 Miami, FL 33131

20       For the Plaintiff:        KATHERINE A. SKEEL
                                   HOLLAND & KNIGHT LLP
21                                 31 West 52nd Street
                                   New York, NY 10019

22
         For the Defendant,        BRANDON J. WITKOW
23       Wilmington Savings Fund   WITKOW BASKIN
         Society, FSB:             21031 Ventura Boulevard, Suite 700
24                                 Woodland Hills, CA 91364

25       For the Defendant,        SAMUEL KARPEL

1    Elliott Brisk:                EINHORN KARPEL PC
                                    66 Split Rock Road
2                                   Syosset, NY 11791

3    For the Defendant,           HERMAN SEGAL, PRO SE
     Herman Segal:

4

5
                          Khaleelah Gantt, CET**D-285
6                                  eScribers
                             7227 North 16th Street
7                             Phoenix, AZ 85020
                              www.escribers.net

8

     Proceedings recorded by electronic sound recording; transcript
9    produced by transcription service.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy

1              THE CLERK:  (Audio begins mid-sentence) conference for

2    case number 21-CV-1540, Wilmington Trust N.A. v. Segal and

3    Segal calls for a telephone status conference for case number

4    23-CV-5945, Hancock Insurance Company v. Wilmington Savings

5    Fund Society FSB, et al.

6              Before I ask the parties to state their appearances, I

7    will state the following.  Persons granted remote access to

8    proceedings are reminded of the general prohibitions against

9    recording and rebroadcasting of court proceedings.  Violations

10   of these prohibitions may result in sanctions, including

11   removal of court issued media credentials, restricted access to

12   future hearings, denial of future hearings, and any other

13   sanctions deemed necessary by the court.

14             Due to the number of callers, I ask that everyone

15   please state your full name when addressing the Court.  That

16   being said, if counsel for the plaintiff, Wilmington Trust N.A.

17   please state your appearance.

18             MR. JESUS CUZA:  Good morning, Your Honor, Jesus Cuza

19   on behalf of Wilmington Trust and with me on the other line is

20   Rebecca Canamero.

21             THE CLERK:  For the pro se defendant Segal (ph.),

22   please state your full name for the record.

23             MR. HERMAN SEGAL:  Herman (ph.) Segal, defendant pro

24   se.

25             THE CLERK:  For plaintiff John Hancock Insurance

Colloquy

1    Company of New York, please state your appearance.

2            MS. JACLYN METZINGER:  Good morning, this is Jaclyn

3    Metzinger from Kelley Drye and Warren.  And on the other line,

4    I have my colleague Caitlin Hickey.

5            THE CLERK:  Counsel for defendant Wilmington Savings,

6    please state your appearance.

7            MR. BRANDON WITKOW:  Good morning, this is Brandon

8    Witkow on behalf of Wilmington Savings Fund.

9            THE CLERK:  And for defendant, Elliott Brisk (ph.),

10   please state your appearance.

11           MR. SAMUEL KARPEL:  Good morning, this is Samuel

12   Karpel from Einhorn Karpel PC on behalf of Elliott Brisk.

13           THE COURT:  Okay.  Good morning to you all.  So as you

14   have seen from the docket, the Court has been presiding over a

15   case with a lower docket number 21-CV-1540, Wilmington Trust

16   N.A. v. Segal for some time now and I have had multiple

17   conferences with Mr. Cuza.  The case was headed for default, we

18   then got Mr. Segal's attention in connection with the default

19   motion practice and he has been engaged in the case since that

20   time and appearing at conferences.  In the meantime in 2023,

21   second case was filed, John Hancock Life Insurance Company v.

22   Wilmington Savings Fund Society, FSB.

23           And given some of the factual allegations in each

24   case, the Court was concerned that it might make sense for us

25   to try to untangle both of these cases together.  So we asked

Colloquy

1     you all here today to give an overview essentially of where

2     things stand with respect to each case, what is going on in

3     each case and whether or not the parties are of the view that

4     these cases should be deemed related or consolidated for

5     purposes of case management, not necessarily consolidated for

6     disposition, but just want to understand the most efficient way

7     of moving forward, ultimately of course with the goal of trying

8     to resolve them both.

9          So Mr. Cuza and I have had innumerable conferences at

10    this point, but I am -- welcome your thoughts to start sir, as

11    the plaintiff in the oldest filed case as to how we should be

12    approaching both cases and what's going on in the first case,

13    Wilmington Trust v. Segal.  So Mr. Cuza starting with you.

14         MR. CUZA:  Good morning, Your Honor.  Your Honor, as

15    you know and as the record reflects, a partial judgement in our

16    case was entered in late 2022.  Since then, in this case, the

17    issue that we have been dealing with has to do with the date of

18    birth of Ms. Segal.  During the summer of 2023, we deposed

19    Herman Segal and during that deposition, Your Honor, you might

20    recall that Mr. Segal appeared at his deposition without any

21    documents requested relating to the issue of Ms. Segal's date

22    of birth.  Mr. Segal's representation at least one telephone

23    conference with Your Honor, where Mr. Segal, number one

24    admitted that he personally has no knowledge of the date of

25    birth of his mother, and number two is that he believes he had

Colloquy

1    the right to take and invoke the Fifth Amendment because of

2    having documents relating to the date of birth that would

3    implicate him in the commission of a crime.

4         After that, Your Honor, we conducted discovery, which

5    we informed the Court that we were going to do, number one on

6    John Hancock and second, dependent from that discovery, Your

7    Honor, we conducted our own independent investigation and hired

8    an investigator.  As a result of our efforts, Your Honor, we

9    did come across ancient documents signed by Ms. Segal that

10   confirm that her date of birth, is in fact the date of birth

11   reflected in the application for insurance, specifically the

12   year 1926.  As a result of the Federal Rules of Evidence, we

13   informed Your Honor in November that we're prepared to file a

14   motion for summary judgment.

15        We have that motion for summary judgment and we have

16   the pre-motion letter drafted.  Our intent, Your Honor, is to

17   file the letter today or tomorrow.  What we were hoping to

18   cover during today's call with you and Mr. Segal, was consent

19   to you resolving the issue of the motion for summary judgment

20   in light of the fact that we have been working with you for

21   probably two years now. And there's no question, Your Honor,

22   that you're very familiar with the case.  So that's where we

23   are, Your Honor.

24        We're not familiar with the other litigation with one

25   exception.  My recollection is that late last year, you asked



Colloquy

1    if these cases were related.  Your Honor, and you can go back

2    to the record and look at what it is that we represented, but

3    what I am sure of as of the moment that we received the

4    communication from the Court, we were not aware of that

5    litigation.  So Your Honor, I think that covers the background

6    and covers where is it that we are at this particular point in

7    time in this case.  We're happy to learn that Hancock's

8    attorney is on this call.  So Your Honor, I will stop there and

9    happy to cover whatever else you want me to cover.

10          THE COURT:  Thank you, Mr. Cuza.  One small point that

11   you did not mention, no critique, was that I had been asking

12   for a year and a half, where's John Hancock.  And so I am too,

13   happy that John Hancock is here because I think -- there is

14   some hope in my mind, at least, that now that we have all of

15   the players involved in cases before the Court that have been

16   referred to me for case management purposes, perhaps we have

17   the requisite players now to actually resolve these matters.

18   But I think that a lot remains to be seen in that respect.

19          Mr. Segal, is there anything you'd like to say in

20   terms of your views as to the two cases or any updates you'd

21   like to provide in the first case, Wilmington Trust N.A. v.

22   Segal?

23          MR. SEGAL:  Well, I just think that Mr. Cuza perhaps

24   misspoke.  He had mentioned that I had said that I had no

25   knowledge of my mother's birthday.  And the only sense I have

Colloquy

1    no knowledge on is that since I was born after my mother, by

2    definition, I can't vouch for her age, but I'm quite certain

3    that I know what her age is, and I can pretty much provide

4    pretty substantial proof as to what it is.  That's the only

5    thing I wanted to add.

6            THE COURT:  Thank you, Mr. Segel.  Mr. Cuza did say

7    personal knowledge of your mom's birthday and that's kind of

8    lawyer shorthand for, as you pointed out, you couldn't possibly

9    know her birthdate --

10           MR. SEGAL:  Right.

11           THE COURT:  -- as a matter of like witnessing it

12   because you weren't born.  So like all things of that nature,

13   we rely on documents, family lore, people write it in their

14   family books.

15           MR. SEGAL:  Right.

16           THE COURT:  But he did -- I think he did mean that you

17   couldn't personally testify to knowing it, having witnessed it.

18           MR. SEGAL:  That's correct.

19           THE COURT:  That's how I understood it.  So thank you

20   for that clarification, sir.

21           Ms. Metzinger, on behalf of John Hancock, would you

22   like to give me a little bit of an overview with regard to

23   where things stand in the second case?  This is the first time

24   we're conferencing your case, so I like to learn a little bit

25   more about the underlying allegations, and I'm curious to hear

Colloquy

1    your thoughts on the interplay between the two matters.

2        MS. METZINGER:  Absolutely, Your Honor.  So we filed

3    our interpleader complaint in August of 2023, both of the

4    claimants have answered that complaint.  And we wrote to Judge

5    Henry in October because there were a few issues that we wanted

6    to bring to her attention.  And really there's two issues in

7    our case.  So the first is the date of birth issue that I

8    understand is being litigated in the first case, which, as you

9    noted, we have not been a party to although we have provided

10   some discovery.  And the second issue in our case, which

11   necessitated the interpleader filing was who actually has the

12   rights to the benefit on our policy.  And so really those are

13   the two main issues in our case, and both of those sort of had

14   an outside influence on how the case was going to move forward,

15   I think, from the perspective of the two claimants, at least.

16        There was a New York Court of Appeals case that had

17   been referred to by the Second Circuit relating to the

18   effectiveness of an assignment of a life insurance policy when

19   the insurance company is not put on notice of the assignment.

20   And so in this case, Mr. Brisk is alleging or has claimed to

21   Hancock that he obtain an assignment of our policy from Mr.

22   Segal, but John Hancock was never put on notice of that

23   assignment.  Whereas, second claimant, Wilmington, has an

24   ownership interest on record with John Hancock, these are

25   the -- a couple of different changes of ownership that have

Colloquy

1   happened over time.

2          And so it's my understanding that the two claimants

3   were waiting for the decision from the New York Court of

4   Appeals to sort of shape their strategies going forward.  That

5   decision came down at the end of November and in sum and

6   substance held that an assignee whose assignment has not -- for

7   whom the insurance company has not been put on notice, no

8   longer has -- or doesn't have standing to assert that claim as

9   against the insurance company.

10          So I think after we saw that decision, we anticipated

11   that Mr. Brisk may change his litigation strategy vis-a-vis

12   John Hancock.  Certainly Mr. Karpel can advise the Court what

13   he intends to do.  But it's our understanding that he continues

14   to maintain his claim against John Hancock and so it's John

15   Hancock's preference to get an order of interpleader, pay the

16   funds into the registry of the Court, and then let Mr. Brisk

17   and Wilmington litigate amongst themselves with respect to who

18   is entitled to the payment of the death benefit.

19          With respect to whether the cases are related or

20   should be consolidated, it's certainly true that there is an

21   overlapping issue regarding the date of birth.  They are

22   different policies though and as I said earlier, Hancock has

23   not been a party to the first case, and Mr. Segal is not a

24   party to our case.  So there are some differences, but there

25   are certainly some factual and legal overlap.

Colloquy

1          THE COURT:  Well, there's only one date of birth.  But

2    with consistent litigation on that question, I do think these

3    cases do need to be evaluated in tandem.

4          All right.  On behalf of Mr. Brisk, Mr. Karpel, would

5    you like to start?

6          MR. KARPEL:  Yes, yes.  So Your Honor, Mr. Brisk was

7    assigned the life insurance policy in 2006 and we understand --

8    or it has become apparent that at some later point, Mr. Segal

9    apparently assigned the policy to another party and then there

10   was subsequent assignments thereafter.  And so it was our

11   position and it is still our position that that assignment is

12   still valid.  The Brettler v. Allianz case, from our

13   perspective, does not change our position with respect to the

14   validity of the assignment.  In that case, it did hold that the

15   assignee could not enforce any contractual rights of the

16   policyholder against the insurer, but we still assert that the

17   actual assignment is valid and our client does not lose any

18   ownership interest or rights to the policy by the fact that it

19   was later assigned.

20          So the Brettler case does not change our position.  I

21   think that John Hancock had acknowledged prior to the Brettler

22   case that there is two competing claims with respect to

23   ownership and that's why there was the interpleader action.

24   And so our position hasn't changed because of the Brettler

25   case.  But as far as the issue with respect to the date of

12

Colloquy

1    birth, that is an issue that appears to be in both cases, the

2    exact same issue.  We pointed it out to Magistrate Judge Henry

3    in our letter and in my perspective it would make sense to have

4    our case heard together with the first case because of that

5    main issue.

6           THE COURT:  Okay.  And on behalf of Wilmington

7    Savings, Mr. Witkow.

8           MR. WITKOW:  Yes.  Good morning, Your Honor.  I too

9    agree on the date of birth issue and what John Hancock is

10   proposing, subject to the details of the stipulation for

11   interpleader is to interplead the undisputed principal balance

12   of the policy, less the amount they want to withhold as a

13   result of the date of birth issue.  And so I too agree that the

14   date of birth issue should resolve both of the cases on that

15   issue and if decided in favor that it's 1926, then John Hancock

16   should interplead the remaining funds.

17          Now, with respect to the facts of our case, just so

18   Your Honor understands the time line here, this policy was

19   taken out by Mr. Segal on behalf of his mother in 2006 and

20   apparently immediately assigned into a trust for his mother.

21   Then several years later, Mr. Segal sold the policy to another

22   party and made representations in that sale and purchase

23   agreement that there were no previous assignments and that Mr.

24   Segal was the only beneficiary of the policy.

25          That policy was again then sold two more times and my

Colloquy

1    client purchased the policy carrying those representations in

2    2013 and has made premium payments on that policy through the

3    date of birth of Ms. Segal.  Mr. Brisk's position, he made no

4    payments.  His position essentially is he received the

5    assignment shortly after in 2006, essentially made maybe one or

6    two premium payments in 2006 or 2007, has not made premium

7    payments in the ensuing 13 years until her death.  And in

8    taking the position that that's a valid assignment and he,

9    therefore, is entitled to the death benefit proceeds.

10            Obviously, my client disagrees, they were the rightful

11    purchaser of the policy, complied with the policy terms, notice

12    was provided to the insurer, which was acknowledged by John

13    Hancock and therefore we believe we're entitled to the full

14    death benefit proceeds.  So that's the precise issue between my

15    client and Mr. Brisk, is essentially whether that -- let's call

16    it the hidden assignment, because that's what it's referred to

17    in the Brettler v. Allianz case.  That it was assigned without

18    notice to the insurer continues to be a valid assignment under

19    New York law giving Mr. Brisk a contractual right to the death

20    benefit proceeds.

21            So that's the principal issue that remains, whether or

22    not the Brettler v. Allianz case determines that issue, whether

23    a hidden assignment is valid under New York law, I think Mr.

24    Karpel and I disagree as to the effect of that decision on this

25    issue for our case.

Colloquy

1          THE COURT:  But it does sound like a legal issue, do

2     you agree with that, Mr. Witkow?

3          MR. WITKOW:  It does have some factual components.  I

4     think, obviously, if Mr. Brisk had complied with the other

5     policy terms principally making premium payments to get the

6     benefits of being the policy owner, whether or not he made

7     premium payments is somewhat of a factual determination.  But I

8     suppose, it's going to be undisputed because John Hancock will

9     know who they received premium payments from.

10          THE COURT:  Right.  So I'm just trying to understand

11     where this is all headed, right.  So Mr. Cuza indicated that

12     he's basically prepared to, as of today, to file a motion for

13     summary judgement for clarification of Ms. Segal's birth date.

14          Mr. Cuza, to your knowledge, is there any evidence

15     that the Court would need to take in connection with that

16     motion in terms of live testimony or is this really an

17     evaluation of ancient documents as it's really a question as to

18     which there's no fact dispute about the available factual

19     record?

20          MR. CUZA:  Your Honor, our motion would be based on

21     the existence of the ancient documents supported by the

22     position taken by Mr. Segal during the deposition, which

23     includes not bringing to the deposition any documents relating

24     to the date of birth based on his representation under oath

25     that he had no documents at the time.  So Your Honor, I think

Colloquy

1    that -- well let me add to that, Your Honor.

2           There's no question, right, there's no question that

3    there's a case that was filed in New Jersey, Mr. Segal's behind

4    that case, where in that case it was represented that the date

5    of birth of Ms. Segal was 1924.  There's also no question, Your

6    Honor, that there's a death certificate which was prepared with

7    the information provided by Mr. Segal that also states that the

8    date of birth of Ms. Segal was 1924.  Now, Your Honor, with

9    regards to the social security number provided for Ms. Segal

10   was incorrect and not true and the social security number

11   provided was for someone that, at the time, and maybe still

12   today was alive and lives in Florida.

13          Together with that, Your Honor, we have the statements

14   of Mr. Segal, to Your Honor, specifically stating and raising

15   his right to invoke the Fifth Amendment.  And at the time, the

16   implication of that statement was that he caused certain

17   documents to be produced referring to the date of birth and

18   those documents referring to the date of birth, which we are

19   assuming based on his statement, he was referring to the 1924

20   year of birth, Your Honor.  So the implication is that his

21   representations at the time were simply not true, that's where

22   the Fifth Amendment comes into play.

23          So Your Honor, that is a summary of what our motion is

24   going to cover.  Your Honor, there's a little bit more.  Your

25   Honor, you might recall that there's certain documents that Mr.

Colloquy

1    Segal provided to us, where he represented to us that these

2    documents would absolutely prove that a date of birth of his

3    mother is 1926, the date on the policy.  What Mr. Segal did,

4    was he redacted the date of birth because what Mr. Segal wanted

5    was for my client to pay Mr. Segal money in order for him to

6    produce the unredacted documents showing that the date of birth

7    was 1926.  So that also adds to, Your Honor, facts that clearly

8    demonstrate that the date of birth of Ms. Segal was 1926.

9            One of the ancient documents that we have, Your Honor,

10   is a document that dates back to the 1950s, and it's actually a

11   document filed with the Eastern District of New York.  So Your

12   Honor, I gave you kind of a long explanation of what we have

13   right now and what the motion for summary judgement is going to

14   look like.  Again, this motion for summary judgement was

15   drafted looking at the facts based on the record that we have

16   in this particular case and the actions of Mr. Segal.  So let

17   me stop there, Your Honor, because I believe I answered your

18   question.  Maybe I gave you a little bit more than what you

19   were asking for.

20           THE COURT:  I was really just trying to understand,

21   Mr. Cuza, was your view as to whether or not your anticipated

22   summary judgement motion was accounting for the possibility

23   that others could come forward to say that the factual record

24   isn't complete in terms of whether or not there may be

25   questions that need to be resolved by trier of fact, consistent

Colloquy

1    with summary judgement standards.

2         So I'm just trying to understand the sort of outline

3    of it because it appears to me that the date of birth question

4    is an antecedent question to how the parties can proceed in

5    both cases.  Mr. Cuza has been negotiating with John Hancock

6    now for a lengthy period of time and John Hancock is

7    understandably concerned about giving the full benefit if the

8    date of birth on the initial life insurance application was

9    fraudulent.  But they also haven't been participating in the

10   first case, which is what led me to ask Mr. Cuza many many

11   months ago, if not two years ago, where is John Hancock, do we

12   need them here to be representing their position in light of

13   the challenges we faced in locating Mr. Segal initially.  Mr.

14   Segal was not participating either.  And whether or not there

15   is an actual live factual dispute about her birthdate.

16        I mean, birthdates are the kind of thing that usually

17   can be ascertained with a reasonable degree of certainty, but

18   the farther back someone is born, of course, the more difficult

19   it becomes.  And when fraud is suspected, it becomes of course,

20   even more difficult.  So it seems to me that it would benefit

21   both cases to have a determination as to the date of birth.  It

22   would perhaps move the negotiations forward with John Hancock

23   in case number one to have clarification as to the date of

24   birth.  And as to the second case, correct me if I'm wrong Ms.

25   Metzinger, but it seems as though the amount of interpleader

Colloquy

1    deposit will vary depending upon this question.

2                Can you shed some light on that?

3                MS. METZINGER:  Yes.  That's right, Your Honor.  I

4    believe the discrepancy -- I actually don't know what the

5    discrepancy is in the first case.  But --

6                THE COURT:  A couple million dollars.

7                MS. METZINGER:  Okay.  So it's a smaller discrepancy

8    in the policy at issue in case number two certainly, but there

9    is a difference, both with respect to the principal of the face

10   amount of the policy and with respect to the interest that has

11   accrued on that difference.  So I tend to agree with you, Your

12   Honor, that it makes sense for these to be determined at the

13   same time.  But John Hancock has no knowledge of these ancient

14   documents that Mr. Cuza is referring to.  We obviously haven't

15   been participating in any of the discovery in the first case

16   and there are some other medical records in the subpoena

17   production that we provided to Holland and Knight, that shows

18   both dates.  We have some medical records that show a 1926

19   birthdate and some records that show a 1924 birthdate.  So we

20   would certainly want to be able to participate in any

21   proceeding that would determine that issue.

22               THE COURT:  Okay.

23               MR. CUZA:  Your Honor?

24               THE COURT:  I'm sorry.  Is that you, Mr. Cuza?

25               MR. CUZA:  Yes, Your Honor.  Your Honor, I was going

Colloquy

1    to add we absolutely welcome, Your Honor, the consolidation of

2    the cases because we do agree, right, that Hancock clearly is a

3    very important party.  And resolving this issue, this is going

4    to benefit both cases, which it clearly absolutely will, Your

5    Honor, it does make sense to consolidate both cases and address

6    both cases on this particular issue together.

7             THE COURT:  Okay.  So my suggestion at this

8    juncture -- I mean, this is obviously just a very unusual

9    posture to have two kind of related cases that aren't fully

10   overlapping where one is -- John Hancock's goal is to like -- I

11   think of these interpleader cases as like, deposit the money

12   and run is kind of my shorthand view of how a lot of these

13   interpleader cases feel.  But in this instance, Ms. Metzinger,

14   I do think that John Hancock, obviously, has an interest in

15   potentially participating, as you indicated with regards to

16   some of these initial questions.  What would you like to do,

17   Ms. Metzinger?  What makes sense to you?

18            MS. METZINGER:  I mean, I think that at the very

19   least, I think that any discovery in the first case that

20   pertains to this issue would have to be shared. Certainly I

21   would like to see it, I presume the --

22            THE COURT:  Mr. Cuza has been showing it to John

23   Hancock for a long time, haven't you, Mr. Cuza?

24            MR. CUZA:  Yes, Your Honor.

25            THE COURT:  So that's part of the issue, Ms.



Colloquy

1    Metzinger, John Hancock isn't listening to Mr. Cuza.  Not you

2    personally, obviously, but he has been trying to get John

3    Hancock to recognize these ancient documents for months, which

4    is what's led us to this point in terms of him seeking a

5    summary judgement determination.  So perhaps the first step is

6    for the parties here to discuss it and meet and confer.  I

7    don't know, Ms. Metzinger, if there's different sort of

8    divisions or departments or lawyers involved with regard to the

9    two cases.  But John Hancock is not necessarily acting with

10   full information across the cases, if that makes sense to you,

11   Ms. Metzinger.

12           MS. METZINGER:  Your Honor, if there have been

13   conversations with my client between Mr. Cuza and my client in

14   the last few months, I am not aware of them.  When I first got

15   retained in connection with the subpoena that was served on the

16   company, Mr. Cuza represented to me that he would be willing to

17   share these documents with me, and I have never received them

18   from him.

19           THE COURT:  Mr. Cuza, who have you been interacting

20   with?  It's the policy group or somebody else?

21           MR. CUZA:  Your Honor, we have been interacting with

22   in house counsel.  But Your Honor -- and certainly the

23   information, the documents that were shared with John Hancock

24   it's by letter, right, they're emails -- it's all written.  We

25   don't have a problem, by the way, Your Honor, sharing with

Colloquy

1    counsel the information that we have, at all.  So having a meet

2    and confer, Your Honor, we welcome that.  Consolidating both

3    cases, Your Honor, we welcome that.  Because the reality is we

4    absolutely need to do whatever it is that we need to do to

5    bring this issue to closure, and John Hancock is not only an

6    important party, Your Honor, but as you suggested in the past,

7    it really has become an indispensable party.

8         THE COURT:  Yeah.  So I mean just so you know, Ms.

9    Metzinger, I have floated the idea and in fact put it in an

10   order in a 1540 case that the Court was contemplating adding

11   John Hancock myself as a necessary party because we could not

12   get forward movement on sort of a determination about what they

13   were going to do vis-a-vis the policy.

14        Another thing that I just want to throw out there for

15   all parties to consider as you try to map out some kind of next

16   steps, is what actually makes sense, right.  I completely

17   understand the conflicting nature of the interpleader action,

18   and I don't expect that the parties are going to be able to

19   resolve that without some motion practice because of this

20   intervening Court of Appeals case and questions about the

21   validity of these assignments.  So that's a separate issue,

22   right.

23        But with regard to this date of birth question, it

24   seems to me that it's pretty straightforward.  And it also

25   seems to me that this is the kind of thing that lawyers who are

Colloquy

 1    being completely honest with themselves in terms of how their

 2    motions are going to fly with the Court, should be able to work

 3    it out.  The documents are either authentic or they're not and

 4    either they're going to come in under the rules of evidence or

 5    they're not.  And they're going to have certain probative value

 6    and some of them are going to be higher in probative value than

 7    others.

 8            And the Court is also not unaware of the history of

 9    the frauds at issue here.  Mr. Segal's prior history with that

10    has been illustrated in various cases in the past.  And all of

11    that would be taken into consideration in evaluating the

12    strength of these ancient documents.  The lawyers should be

13    able to do this work and you may be able to save yourselves a

14    lot of motion practice if you have a real honest meet and

15    confer amongst the relevant and interested lawyers and really

16    think hard about which battles are worth fighting and which

17    aren't.  Because I would hate to see -- and Mr. Cuza and I have

18    discussed at lengths, this just spiral into massive litigation

19    or a trial when it's a really clear question.  And the parties

20    should be able to work it out now that everybody is here with

21    an attorney.

22            So in terms of those comments, various things have

23    been suggested.  Mr. Cuza can file for summary judgement,

24    parties can weigh in on it, it's certainly -- you're right, Mr.

25    Cuza to file such a motion.  My question is whether we need to

Colloquy

1    do that first or whether the parties would like an opportunity,

2    thirty days, two weeks, I don't know what's reasonable given

3    the number of schedules to line up for a meeting -- to have a

4    conversation where you candidly review the documents, hash it

5    out with regard to how this litigation would shake out, and

6    each try to go back to their client and make a recommendation

7    and see if we can resolve all this.

8              Let John Hancock deposit whatever amount is the

9    appropriate amount to deposit and then the parties in the

10   second -- John Hancock perhaps, depending on whether they think

11   the 1926 documents are sufficiently weighty and probative, can

12   pay the remainder of the balance in the first case.  If not, we

13   will need to go to motion practice and I recognize that, but

14   perhaps that can be the resolution in case one.  And as to case

15   two, you can make a determination about how much money to

16   deposit and then John Hancock can be done and the Court can

17   take it from there with regard to case number two.  But I would

18   hate to see the parties spin their wheels on mountains of

19   motions if that's not necessary.

20             So what is your reaction to all those comments, Ms.

21   Metzinger?

22             MS. METZINGER:  I'm happy to engage in that kind of

23   meet and confer, Your Honor, I think it makes sense.  But I do

24   want to clarify, just for my own understanding, if Mr. Cuza has

25   been communicating with in house counsel after we were retained

Colloquy

1    in connection with this dispute, because as I said, I am not

2    aware of any such communications after my firm was retained.

3    And I understand that there were communications before --

4          THE COURT:  He did not know about your case until I

5    told him about it, let's be clear.

6          MR. CUZA:  But Your Honor, let me add to that.  We

7    haven't communicated with in house counsel since we began to

8    communicate with outside counsel.  So Your Honor, all of our

9    communications with in house counsel pre-date the date that

10   counsel became involved.  So I think that can clarify the

11   question posed.

12         THE COURT:  Go ahead, Ms. Metzinger.

13         MS. METZINGER:  Okay.  I just didn't want the record

14   to reflect that there had been any recalcitrance on my part or

15   my client in that regard.  It has been, I think six months

16   since the subpoena was served on my client and I had initial

17   conversations with Mr. Cuza about the subpoena.  And so I just

18   didn't want Your Honor to have the impression that we had been

19   sitting on our hands or delaying this in any way.  As I

20   mentioned --

21         THE COURT:  I'm not in any way attributing John

22   Hancock's reluctance to pay the two million in Mr. Cuza's case

23   to you.  I think it's them, so don't take it the wrong way.

24         MS. METZINGER:  Well, I think they're in a tough spot,

25   right, because they have governmental documents and medical

Colloquy

1    records that show one date and then there are these ancient

2    documents that show another date.  But as I said --

3            THE COURT:  Well, medical records are not necessarily

4    admissible to prove this point.  The only thing that's

5    admissible in medical records are for purposes of treatment,

6    probably your difference in age is arguably not relevant to

7    treatment at all.

8            MS. METZINGER:  Sure.  All I'm saying, Your Honor, is

9    that there is a discrepancy among all the documents, at least

10   that I have seen.

11           THE COURT:  For sure.  That's why the parties need to

12   sit down and really evaluate what exists and what the relevancy

13   of those documents are and tease out how a court is likely to

14   review it.  I mean, if -- that's why I was asking Mr. Cuza if

15   this was the kind of thing where we need to have a hearing.  If

16   there's nobody alive who can say I was present on the date of

17   Ms. Berger --

18           What's her maiden name, is that correct, Mr. Cuza?

19           MR. CUZA:  I'm sorry, your Honor, I didn't hear the

20   last part.

21           THE COURT:  What was her maiden name, Berger?

22           MR. SEGAL:  Berkowitz.

23           THE COURT:  Berkowitz.  Unless somebody is alive who

24   can say they were present for her birth, the documents are all

25   we have, right.  And the fact that there are discrepancies in

Colloquy

1   documents doesn't mean that those documents have evidentiary

2   value and that's what I want the parties to really think hard

3   about.  Looking at the medical records, for example, medical

4   records don't prove even who the person is being treated, they

5   aren't even admissible to prove identity.  The only reason

6   medical records are deemed reliable is because who are injured

7   or sick generally tell the doctor what's wrong with them

8   truthfully.  That's the only piece of medical records that are

9   reliable under the Federal Rules of Evidence.

10        I don't know what other documents exist that have

11  inconsistencies but think about the underpinning for the

12  relevancy in every single hearsay exception that may attend to

13  these records.  And think hard about whether the records you

14  point to for discrepancies matter with regard to the date of

15  birth, because that's what the Court's going to do.  And I

16  encourage the parties to do it first to save yourself the work

17  if you can reach an agreement.  If John Hancock absolutely

18  doesn't want to do this and they want to file the motions,

19  that's what we're here for, but it just seems like an utter

20  waste of time if the parties can figure it out on their own.

21        That's why I've been encouraging Mr. Cuza to try to

22  resolve it with John Hancock from the get-go because that's

23  really his goal in case number one.  His goal is not so much

24  about suing Mr. Segal, who not that long ago was in bankruptcy.

25  His goal is to get the life insurance proceeds for his clients.

Colloquy

1    And that's what I've been trying to facilitate is if that's the

2    appropriate outcome and in fact it's the most efficient, least

3    litigious way possible.  And I'd like to do the same for both

4    cases.

5           So I encourage you to look at the documents, actually

6    study the Federal Rule of Evidence that could apply to it,

7    think about the rationale underlying the hearsay exception and

8    decide if this document has weight because it might not.  How

9    long would the parties like to do that?

10          Mr. Cuza, what's your vote?

11          MR. CUZA:  Your Honor, we can move quickly, so two

12   weeks is more than enough if the parties want a month, we're

13   happy to do that, but no longer than a month, Your Honor.

14          THE COURT:  Okay.  Mr. Segal, do you have a vote or a

15   view of how long the parties will need for this process?  I

16   don't know if you plan to participate, sir.

17          MR. SEGAL:  I imagine I will, yes, two weeks to a

18   month sounds fair to me.

19          THE COURT:  Ms. Metzinger?

20          MS. METZINGER:  Ordinarily I would say that that time

21   frame sounds perfectly reasonable, Your Honor.  My colleague

22   and I are both preparing for an eight-week jury trial that's

23   scheduled to start on February 6th, so the next 30 days for me

24   are quite booked.  But I'm happy to prioritize this and get to

25   it as soon as I possibly can.

Colloquy

 1          THE COURT:  Well, eight-week trial starting February

 2  6th, puts us in mid-March and that's just not reasonable, Ms.

 3  Metzinger.  You can't spend a couple hours on this in the next

 4  couple of weeks?

 5          MS. METZINGER:  I certainly can, Your Honor.  As I

 6  said, I have not even seen these documents, but as soon as I

 7  get them, I will prioritize my review of them and start

 8  engaging in discussions with Mr. Cuza.

 9          THE COURT:  What's the volume we're talking about, Mr.

10  Cuza?

11          MR. CUZA:  Your Honor, they're six, seven documents at

12  the most.  So these are documents that can be reviewed in 20

13  minutes.

14          THE COURT:  Okay.  All right.  And the Rules of

15  Evidence go quickly as well.  They're my favorite by the way,

16  the Rules of Evidence.

17          Okay.  Mr. Witkow, how long do you think this is going

18  to take?

19          MR. WITKOW:  You're referring to the date of birth

20  issue or the underlying factual issues in our case?

21          THE COURT:  The meet and confer to try to see if the

22  parties can reach any sort of understanding of the date of

23  birth and plan our litigation accordingly.  This is about

24  meeting and conferring.

25          MR. WITKOW:  Got it.  We are deferring -- my position

Colloquy

1    on behalf of Wilmington is we will abide by the Court's

2    decision or a resolution between Mr. Cuza and Ms. Metzinger on

3    the date of birth issue.

4         THE COURT:  Okay.  Mr. Brisk, do you want to

5    participate -- I'm sorry, Mr. Karpel, do you want to

6    participate on behalf of defendant Brisk?

7         MR. KARPEL:  No, I agree with Mr. Witkow that I can

8    stand in the sidelines and the determination that is made by

9    the other parties we'll abide by.

10        THE COURT:  Okay.  So I respect the trial, I

11   understand trial prep can be all-consuming.  At the same time,

12   both of these cases have been pending for a lengthy period.

13   We're talking about a relatively small volume of documents.  I

14   think that they're also quite reasonably organized.  I wouldn't

15   be surprised if Mr. Cuza can send them to you within twenty

16   minutes of this call, based on my observations of Mr. Cuza over

17   the last two years.  So could the parties please provide me

18   with a status report update by February 2nd to just give me a

19   sense of where we're headed.

20        If at that time, Mr. Cuza, you have determined you

21   need to file your summary judgment motion, by all means, I

22   understand that you can file your pre-motion conference letter

23   in accordance with Judge Chen's individual rule.  If the

24   parties in the 1540 case have determined to consent to my

25   jurisdiction with regard to disposition of the motion, you can

Colloquy

1    discuss that with Mr. Segal and file the appropriate form.  I

2    think it's an AO form 85A or something like that.  You can

3    Google it, there's like a consent to disposition on the motion

4    and there's also consent to full jurisdiction, whichever one

5    you prefer if you guys agree you can file it on the docket.  No

6    pressure to do so, but it is your option.

7            So can all of that be filed by February 2nd, Mr. Cuza,

8    starting with you?

9            MR. CUZA:  Yes, Your Honor.  And we will send the

10   email shortly after this call.

11           THE COURT:  Okay.  Mr. Segal, that work for you to be

12   participating in the next couple weeks so that the lawyers can

13   file any appropriate documents by February 2nd?

14           MR. SEGAL:  The only thing is if I could have Ms.

15   Swifinger's (sic) contact information, that would be helpful.

16           THE COURT:  Ms. Metzinger's contact information?

17           MR. SEGAL:  Yes, that's right, I'm sorry.

18           THE COURT:  Okay, the phone cut off a little bit, I

19   just wanted to make sure I was hearing you.

20           MR. SEGAL:  Yes, Ms. Metzinger, yes.

21           THE COURT:  Okay.  So Ms. Metzinger, please stay on

22   the line after the call to exchange information with Mr. Segal.

23           MS. METZINGER:  Sure.

24           THE COURT:  February 2nd date work for you, Ms.

25   Metzinger?

Colloquy

1       MS. METZINGER:  It does, Your Honor.  And also I would

2   ask, Mr. Cuza, if you could send us a courtesy copy of whatever

3   pre-motion letter you file with the Court, that would be

4   greatly appreciated.

5       MR. CUZA:  Sure.  But we're not going to file it until

6   after we have the meet and confer, but --

7       MS. METZINGER:  Okay, okay.  I understand.

8       THE COURT:  Okay.  And Mr. Witkow and Mr. Karpel,

9   based upon the prior representations with regard to your

10  anticipated approach in handling this issue, unless you voice

11  an objection, I take it that that February 2nd date is fine

12  with you.

13      Is that correct, Mr. Witkow?

14      MR. WITKOW:  That is correct, your Honor.

15      THE COURT:  Mr. Karpel?

16      MR. KARPEL:  Yes, Your Honor.

17      THE COURT:  Okay.  So here's my parting suggestion.

18  Everyone just keep an open mind, be reasonable, look hard at

19  these documents, think about how they're going to be received

20  by the Court and act accordingly.  Don't pick battles you can't

21  win, it's a waste of everybody's time, especially yours and

22  it's a waste of your client's money.

23      So with that, I look forward to getting your status

24  report update by February 2nd if we need to decide the issue,

25  we obviously will, but I really do think this is the kind of

Colloquy

1    thing the parties should really try to work out now that

2    everybody's here.  So I want to thank you all for your careful

3    patience today, it was very helpful in understanding the

4    interplay of the two cases.  Hopefully with some clarity on the

5    date of birth, we'll be able to figure out how to move each

6    case forward.

7              With that, is there anything else we should try to

8    address today?  Mr. Cuza?

9              MR. CUZA:  No, Your Honor.

10             THE COURT:  Mr. Segal?

11             MR. SEGAL:  It's just that my pleading the Fifth is

12   not necessarily as Mr. Cuza stated.  It could be the other way

13   that her actual date of birth is 1924, and the hesitation was

14   because on the insurance application with John Hancock I had

15   put down 1926, so that was my reason for claiming the Fifth.

16   And that's neither here nor there, so that's it.

17             THE COURT:  All right, Mr. Segal, thank you.

18             Ms. Metzinger?

19             MS. METZINGER:  Nothing further from me, Your Honor,

20   thank you.

21             THE COURT:  Mr. Witkow?

22             MR. WITKOW:  No, Your Honor, nothing else.

23             THE COURT:  Mr. Karpel?

24             MR. KARPEL:  I have nothing further Your Honor, thank

25   you.

Colloquy

1          THE COURT:  All right.  Take care and I hope that you

2     both -- I hope all of you stay healthy and well and I look

3     forward to hearing about your progress by February 2nd.  Take

4     care, bye bye.

5          (Proceedings concluded)

6                              *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T I O N

2

3            I, Khaleelah Gantt, court-approved transcriber, do

4    hereby certify the foregoing is a true and correct transcript

5    from the official electronic sound recording of the proceedings

6    in the above-entitled matter.

7

8

9    _____           January 18, 2024

10

     Khaleelah Gantt, CDLT-285                    DATE

11

12

     eScribers, LLC

13   7227 North 16th Street
     Phoenix, AZ 85020

14   www.escribers.net

15

16

17

18

19

20

21

22

23

24

25

