# Exhibit B

Page 1

1

2    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

3    -------------------------------------------X

     WILMINGTON TRUST, N.A., as Securities

4    Intermediary,

5                                   PLAINTIFF,

6            -against-              Index No.:

                                    7:23-cv-04654

7

8    HERMAN SEGAL and JOHN HANCOCK LIFE

     INSURANCE COMPANY OF NEW YORK,

9

                                    DEFENDANTS.

10   -------------------------------------------X

11

12                 DATE:  June 18, 2024

13                 TIME:  11:07 A.M.

14

15

16        VIDEOTAPED EXAMINATION BEFORE TRIAL

17   of the Defendant, HERMAN SEGAL, taken by

18   the respective parties, pursuant to a

19   Notice and to the Federal Rules of Civil

20   Procedure, held at Kelley, Drye & Warren,

21   LLP, 3 World Trade Center, 66th Floor,

22   New York, New York 10007, before Amanda

23   Tartaglia, a Notary Public of the State of

24   New York.

25

Page 2

1
2    A P P E A R A N C E S :
3
4    HOLLAND & KNIGHT
        Attorneys for Plaintiff
5       WILMINGTON TRUST, N.A.
        701 Brickell Avenue, Suite 3300
6       Miami, Florida 33131
        BY:  JESUS CUZA, ESQ.
7
8
     KELLEY, DRYE & WARREN, LLP
9       Attorneys for Defendant
        JOHN HANCOCK LIFE INSURANCE COMPANY OF
10      NEW YORK
        3 World Trade Center, 66th Floor
11      New York, New York 10007
        BY:  CAITLIN HICKEY, ESQ.
12           -and-
             STEVEN W. SCHLESINGER, ESQ.
13
14
     ALSO PRESENT:
15      KELLY, DYRE & WARREN, LLP
            JACLYN METZINGER, ESQ.
16          YUSRAA TADJ, Intern
17      PAUL BAKER
        Videographer
18      VERITEXT LEGAL SOLUTIONS
19               *    *    *
20
21
22
23
24
25

Page 3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10  may be signed and sworn to by the witness

11  before anyone authorized to administer an

12  oath, with the same effect as if signed

13  before a Judge of the Court; that an

14  unsigned copy of the deposition may be used

15  with the same force and effect as if signed

16  by the witness, 30 days after service of

17  the original & 1 copy of same upon counsel

18  for the witness.

19

20     IT IS FURTHER STIPULATED AND AGREED that

21  all objections except as to form, are

22  reserved to the time of trial.

23

24              *    *    *    *

25

```
                                        Page 39
 1                    H. SEGAL
 2        A.     Let's see, probably.  That I
 3   can think of.  More than hearsay knowledge.
 4        Q.     And are there people that you
 5   think would have hearsay knowledge that you
 6   didn't list there?
 7        A.     Probably more, other relatives
 8   that would have knowledge of it.  I can't
 9   think offhand.  Definitely my aunt, Judy
10   Berkowicz.  My first cousin was my mother's
11   nephew.  His name is Tzvi Berkowicz, Rabbi
12   Tzvi Berkowicz.
13               (Whereupon, the court reporter
14          asked for clarification.)
15               THE WITNESS:  T-Z-V-I
16          Berkowicz.  I think his English name
17          is different, but maybe it's Tzvi.
18        Q.     And your aunt, Judy Berkowicz,
19   how is she related to your mother?
20        A.     Her sister-in-law, my mother's
21   brother's wife.  She lives in Five Towns as
22   well.  She was -- she is married to my
23   wife's, my mother's brother, so she would
24   obviously know how old my mother is and
25   it's about the same age of my mother and
```

```
 1                    H. SEGAL
 2   she's about 100 and she's doing fine, I
 3   believe.
 4        Q.    Wow.
 5        A.    Yeah.
 6        Q.    And then number 6, "Set forth
 7   in detail any and all communications you
 8   had with Wilmington Trust regarding Lilly
 9   Segal's date of birth."  Have you had any
10   communication with Wilmington?
11        A.    There were some communications,
12   but some e-mails, I guess, that Counsel for
13   Wilmington would have as well.
14        Q.    Okay.
15        A.    But I guess I could produce
16   those if you want them.
17        Q.    If you have any, that would be
18   fine.  And also, just if you could explain
19   them to us.
20        A.    Yes.  After my mother passed
21   away, I was brought in as a defendant on
22   policies on my mother's life because I was
23   not cooperating with Wilmington Trust and
24   them trying to get paid on my mother's
25   death, which they weren't able to get
```

Page 41

1                    H. SEGAL
2    because there was no death certificate
3    under my mother's name and during the
4    course of that litigation, I was in touch
5    with Counsel for Wilmington Trust,
6    Mr. Cuza, and I was suggesting to him the
7    possibility that I would be helpful if
8    there was some compensation for my children
9    or my brother's children.
10        Q.    What do you mean by that?
11        A.    Well, initially, I was in touch
12   with other people who had policies on my
13   mother as far as before Mr. Cuza was able
14   to trace the record of my mother's passing.
15   And that was just vague that I would help
16   them perhaps find proof that my mother had
17   passed away, but subsequently once Mr. Cuza
18   was able to get the bulk of the funds paid
19   by John Hancock, I was in touch with him
20   regarding the possibility of being helpful
21   to him to leave 1926 as the death -- the
22   date for my mother rather than her correct
23   date of 1924.
24        Q.    And so was that before or after
25   the death certificate was drafted?

```
                                          Page 45
 1                    H. SEGAL
 2       Q.     Okay.  Number 10, "Identify all
 3   documents reflecting a different date of
 4   birth than March 26, 1924 or January 24,
 5   1924."  And I'm sorry, that's a typo.  It
 6   should say 1926.
 7       A.     Yeah, no, there was nothing
 8   else.  As far as I know, those are the only
 9   dates that were used.  One is an original
10   date of birth and what was correct to use
11   in the name change and the other one was
12   the one that was used when she came to
13   America and on the life insurance
14   applications.
15       Q.     Okay.  Thank you.
16            COUNSELOR HICKEY:  I think
17       right now might be a good time for a
18       quick break, if you want to go off
19       the record.
20            THE VIDEOGRAPHER:  Standby.
21       The time now is 12:02 p.m.  We are
22       off the record.
23            (Whereupon, an off-the-record
24       discussion was held.)
25            THE VIDEOGRAPHER:  Standby.
```

```
                                    Page 46

 1              H. SEGAL

 2        The time is 12:22 p.m.  We are back

 3         on the record.

 4        Q.    Mr. Segal, when we went off the

 5   record, you mentioned LE Life Expectancy

 6   papers?

 7        A.    Right.  LE standards for Life

 8   Expectancy.

 9        Q.    Okay.

10        A.    There were two or three

11   companies that used to do the, I guess,

12   their opinion, medical opinion of what

13   someone's life expectancy was and that was

14   used as valuation for these policies.

15        Q.    And you said you might have

16   some of those documents?

17        A.    It's possible that I might have

18   those documents as to her date of birth

19   and, yeah, there were two major companies

20   that were doing it, if I recall, that I

21   might be able to find them and get copies

22   of those reports.  They were done in

23   probably 2010.

24        Q.    And you think those reports may

25   reflect your mother's birthday?
```

```
                                                   Page 47
  1                         H. SEGAL
  2          A.     Right.
  3          Q.     Okay.  So I would ask if you
  4   have access to those that you --
  5          A.     Okay.
  6          Q.     -- produce a copy of them?
  7          A.     Yes.
  8          Q.     And when you say life -- LE,
  9   you mean the letter L and the letter E for
 10   Life Expectancy?
 11          A.     Yes.  Yes.
 12          Q.     It's not a company or anything?
 13          A.     No.  No.  No.  I'll -- I'll
 14   remember the names and I should be able to
 15   track them down.
 16          Q.     Thank you.  Are you ready?
 17          A.     Yes.
 18                 COUNSELOR HICKEY:  I will mark
 19           for identification Defendant's
 20           Exhibit 3, I believe.
 21                 (Whereupon, Requests for
 22           Production were marked as Defendant's
 23           Exhibit 3 for identification as of
 24           this date by the reporter.)
 25          Q.     Mr. Segal, do you recognize
```

```
                                        Page 48
 1                    H. SEGAL
 2   this document?
 3        A.     Not specifically, but okay.
 4        Q.     So this document is the
 5   Requests For Production that John Hancock
 6   served in connection with the
 7   Interrogatories, Exhibit 2, that we looked
 8   at just before the break.
 9        A.     Okay.
10        Q.     Have you provided any documents
11   in response to these requests?
12        A.     No, I have not.
13        Q.     And why not?
14        A.     I didn't realize they were --
15   well, the documents, I don't really have
16   many documents, but I didn't think they
17   were relevant anyhow because they would all
18   predate the late '70s or early '80s when my
19   mother had legally changed to her correct
20   date, her Social Security.
21        Q.     So have you looked for
22   documents in response to these requests?
23        A.     Probably not specifically, but
24   I guess if you really want me to try to
25   find it.
```

1                     H. SEGAL
2       Q.     I would really appreciate that.
3       A.     Okay.
4       Q.     So if you do have any and you
5    could produce them, that would be very
6    helpful.
7       A.     Okay.
8       Q.     And I won't make you go through
9    all 32 on the record right now.  I trust
10   that you could do that on your own.  Do you
11   think that might be something that you
12   could do in the next two weeks or so?
13      A.     Yes.
14      Q.     Okay.  Great.  Thank you.
15             COUNSELOR HICKEY:  Now let's
16        take a look at some documents.  Mark
17        for identification Defendant's
18        Exhibit 4 and you'll see there's an
19        exhibit sticker on there.  This was
20        used at your previous deposition, but
21        we'll remark it today for lack of
22        confusion.
23             (Whereupon, an E-mail with
24        Attachments were marked as
25        Defendant's Exhibit 4 for

```
 1                    H. SEGAL
 2        identification as of this date by the
 3        reporter.)
 4        Q.    Mr. Segal, do you recognize --
 5        A.    Yes.
 6        Q.    -- this e-mail and documents?
 7        A.    I do.
 8        Q.    And you sent these to Mr. Cuza;
 9    is that right?
10        A.    I did.
11        Q.    And that was in February of
12    2023?
13        A.    Yes.
14        Q.    At the time that you -- did you
15    photograph these documents that are in this
16    e-mail?
17        A.    Probably.
18        Q.    Okay.  And at that time that
19    you sent these to Mr. Cuza, did you have
20    the physical original documents?
21        A.    I must have, yes.  I did, yes.
22        Q.    And where did you get the
23    physical, original documents from?
24        A.    Either my son had them or they
25    were in storage.
```

```
                                        Page 57
 1                     H. SEGAL
 2   borrowed from him, was that used to pay the
 3   premiums that were owed on the policy?
 4        A.    A substantial amount of it,
 5   yes.
 6        Q.    And will you tell me who this
 7   person is?
 8        A.    Yeah, sure.  His name is
 9   Silber, S-I-L-B, I think it's B-E-R and
10   first name, two brothers, one is Zalman, is
11   the main one and his brother, I don't
12   remember his brother's name.
13        Q.    Is Silber his last name or
14   first name?
15        A.    Last name.
16        Q.    And what's his first name?
17        A.    Zalman.
18        Q.    Zalman, yes.
19        A.    Z-A-L-M-A-N.
20        Q.    So you borrowed the money from
21   Zalman Silber and then he took ownership of
22   the policies; is that right?
23        A.    Yes.
24        Q.    And was that done in writing?
25        A.    Yes.
```

```
                                    Page 58
 1                  H. SEGAL
 2       Q.    And do you have documents to
 3   that effect?
 4       A.    Probably.
 5       Q.    Okay, so I would also ask that
 6   you produce those to the extent that you
 7   have them.
 8       A.    Okay.  I think Platinum is the
 9   name of his company.
10       Q.    Platinum?
11       A.    Something or other, yeah.
12       Q.    And do you know about when this
13   happened?
14       A.    I would have to say probably in
15   about 2011.
16       Q.    Okay.  And so did Mr. Silber
17   then assume the premium payments going
18   forward?
19       A.    He did.
20       Q.    So looking back at Exhibit 4 on
21   the next page, there's another document, do
22   you know what this document is?
23       A.    Yes.
24       Q.    And where did you get it?
25       A.    Part of the papers my mother
```

```
                                          Page 59
 1                    H. SEGAL
 2    was -- was holding.
 3         Q.    And this also -- I know it's a
 4    bit hard to see, but this also seems to say
 5    Lenke Berkowicz?
 6         A.    Yes.
 7         Q.    Is that right?
 8         A.    Yes.
 9         Q.    And is that referring to your
10    mother?
11         A.    Yes, it's her marriage
12    certificate.
13         Q.    This document -- oh, I think
14    you went ahead one page too far.
15         A.    You said --
16         Q.    I'm sorry.  Page 2, Exhibit 4.
17         A.    Yeah, that's the I.D.
18    Certificate in Lieu of Passport.
19         Q.    And this document was part of
20    your mother's paperwork?
21         A.    Yes.
22         Q.    Okay.  And this stamp at the
23    bottom, which is also a bit hard to read,
24    but to me it looks like it says December
25    maybe 10th and then 1947; do you see that?
```

```
                                        Page 60
 1                    H. SEGAL
 2        A.    Yes.  It says 9th, actually, if
 3   you look on the right side.
 4        Q.    Thank you, yeah.  I do see
 5   that.  Thank you.
 6        A.    With my mother's...
 7        Q.    And it looks like there's some
 8   paper covering up dates --
 9        A.    Yes.
10        Q.    -- on this document, as well;
11   is that right?
12        A.    Yes.
13        Q.    So starting in the top,
14   right-hand corner, do you remember what
15   that paper was covering?
16        A.    You want to know the date
17   underneath it?  I don't know the date.
18        Q.    Not the date, necessarily, just
19   what information would have been in the
20   top, right-hand corner that says Doc I.D.
21   or --
22        A.    Probably, yes.
23        Q.    And then underneath that,
24   there's a date ending in 1947?
25        A.    Right.
```

Page 61

1                    H. SEGAL
2        Q.    So I assume the rest of the
3   information is the entire date?
4        A.    Right.
5        Q.    And then on the second line and
6   the third line, it looks like this may be
7   your mother's date of birth; is that right?
8        A.    Yes.
9        Q.    And you covered that up, as
10  well?
11       A.    I did.
12       Q.    And do you remember what it
13  said underneath this paper?
14       A.    Everything had the same date of
15  3/26/26.
16       Q.    And, again, why did you cover
17  this information?
18       A.    Because I wanted Mr. Cuza to
19  pay for the originals.
20       Q.    And would you be willing to
21  give us copies of the originals to the
22  extent you're able to access them?
23       A.    Sure.
24       Q.    And then turning the page -- to
25  Page 3, this looks like it's just the same

1                        H. SEGAL

2      document but folded, so you can't see

3      whether it's the back or the bottom; do you

4      see that?

5           A.    Yes.

6           Q.    And that also has some

7      information covered?

8           A.    Yes.

9           Q.    Do you know why you covered

10     this information?

11          A.    Just covering other things, I

12     feel I cover this as well just to make it

13     more difficult to acquire.  I'm sure this

14     is not acquirable other than the original.

15          Q.    Okay.  And then turning to

16     Pages 4, 5 and 6, we can start with Page 4,

17     do you know what this document is?

18          A.    That's my mother's marriage

19     certificate to my father.

20          Q.    And this document also referred

21     to Lenke Berkowicz; is that right?

22          A.    Yes.

23          Q.    And I'm having a hard time

24     reading your father's name, can you tell me

25     what it is?

Page 107

H. SEGAL

1

2     A.    I do, yes.

3     Q.    And what is it?

4     A.    It's a -- a part of a -- a

5  court record that supposedly is a copy of a

6  driver's license.

7     Q.    And why do you say supposedly?

8     A.    Because the picture is not my

9  mother and my mother never had a driver's

10  license and, of course, the date of birth

11  is incorrect as well and, of course, the

12  signature is not my mother's.

13     Q.    Why do you say the signature is

14  not your mother's?

15     A.    Because I know my mother's

16  signature.  It's not my signature and it's

17  not my mother's for sure.

18     Q.    What about the rest of the

19  information on this driver's license?

20     A.    The name and the address are

21  correct.  I can't make out anything else,

22  but the license is a forgery.

23     Q.    Okay.  You can set that aside.

24           Did your mother have any forms

25  of identification?

```
                                              Page 108
 1                      H. SEGAL
 2          A.      No.
 3          Q.      She didn't have a passport?
 4          A.      No.
 5          Q.      Did your mother have a written
 6    will?
 7          A.      At one time or another, yes.
 8          Q.      And do you have a copy of that
 9    will?
10          A.      I might be able to -- floating
11    around somewhere.
12          Q.      Do you know if that will has
13    your mother's date of birth on it?
14          A.      I don't think a will has a date
15    of birth.  I'm pretty sure it doesn't.
16          Q.      Do you have access to the will?
17          A.      I mean, again, there are papers
18    floating around and I could go through them
19    and see if I can find it.
20          Q.      To the extent you have access
21    to them, I would appreciate that and ask
22    that you produce it if you have it.
23          A.      Okay.
24          Q.      Thank you.
25                  COUNSELOR HICKEY:  We could
```

```
                                        Page 109
 1                      H. SEGAL
 2           mark for identification as
 3           Exhibit 12.
 4                 (Whereupon, a Death Certificate
 5           was marked as Defendant's Exhibit 12
 6           for identification as of this date by
 7           the reporter.)
 8           Q.    Do you recognize this document?
 9   And you'll see that there is a document
10   attached to it, as well.
11           A.    Yes.
12           Q.    And what is it?
13           A.    It's a death certificate.
14           Q.    And so focussing on the death
15   certificate, who is the death certificate
16   -- who is the decedent on the death
17   certificate?
18           A.    The name is Sprinta Berger,
19   which was my mother.
20           Q.    And at this time, your mother
21   had already -- you had already filed the
22   name change petition for your mother?
23           A.    Yes.
24           Q.    And the death certificate is
25   dated November 7, 2018; is that right?
```