UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOHN HANCOCK LIFE INSURANCE COMPANY OF NEW YORK,

Interpleader Plaintiff,

- against -

WILMINGTON SAVINGS FUND SOCIETY, FSB,

Interpleader Defendant,

- and -

ELLIOT BRISK, *as Trustee of the Lilly Segal Trust*,

Interpleader Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
23-CV-5945 (PKC) (TAM)

PAMELA K. CHEN, United States District Judge:

This action arises from a dispute over who rightfully owns the proceeds of a life insurance policy. Plaintiff John Hancock Life Insurance Company of New York ("John Hancock") issued the life insurance policy in dispute, and has brought this interpleader action against Defendants Wilmington Savings Fund Society, FSB ("Wilmington Savings") and Elliot Brisk as Trustee of the Lilly Segal Trust ("Brisk"), who both claim that they are entitled to the proceeds. Wilmington Savings has filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c), which is now fully briefed.[1] For the reasons

[1] (*See* Mot. J. Pleadings ("Mot."), Dkt. 52; Mem. Supp. Mot. ("Mem."), Dkt. 52-1; Req. for Judicial Notice Supp. Mot. ("Req. for Judicial Notice"), Dkt. 52-2; Mem. Opp'n Mot. ("Opp'n"), Dkt. 54; Reply Supp. Mot. ("Reply"), Dkt. 55.)

explained below, the Court finds that Wilmington Savings is entitled to the proceeds. Wilmington Savings's motion is therefore granted.

## BACKGROUND

### I. Interpleader Actions

In an interpleader action such as this one, the plaintiff is a "neutral stakeholder" who faces competing claims from different claimants to the same fund or property in the stakeholder's possession. *CF 135 Flat LLC v. Triadou SPV S.A.*, No. 15-CV-5345 (AJN), 2016 WL 1109092, at *2 (S.D.N.Y. Mar. 18, 2016) (citation omitted); *see Wash. Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993) ("Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund."). The action generally proceeds in two steps. *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 143 (2d Cir. 1988). At the first step, the court must "determine whether the stakeholder is entitled to bring an interpleader action." *Id.* If so, the stakeholder can deposit the disputed funds or property with the court, *see id.*, and is thereafter discharged from liability, *see Metro. Life Ins. Co. v. Mitchell*, 966 F. Supp. 2d 97, 102 (E.D.N.Y. 2013) (citing *N.Y. Life Ins. Co. v. Conn. Dev. Auth.*, 700 F.2d 91, 95 (2d Cir. 1983); *Locs. 40, 361 & 417 Pension Fund v. McInerney*, No. 06-CV-5224 (JFK), 2007 WL 80868, at *3 (S.D.N.Y. Jan. 9, 2007)). At the second step, the court must determine which of the competing claimants—the interpleader defendants—is entitled to the fund or property. *See John Hancock Life Ins. Co. (U.S.A.) v. Eisdorfer*, No. 24-CV-2974 (ERK) (CHK), 2026 WL 1398956, at *3 (E.D.N.Y. May 19, 2026). The court does so "just as it would in any other civil action." *Avant Petroleum*, 853 F.2d at 143; *accord* 7 *Wright & Miller's Federal Practice and Procedure* § 1714 (3d ed. Apr. 2026) ("Absent special circumstances, this second phase will proceed like any other action.").

## II. Factual Background[2]

On January 26, 2006, Herman Segal ("Herman") took out a policy from John Hancock insuring the life of his mother, Lilly Segal ("Lilly") (the "Policy"). (*See* Compl., Dkt. 1, ¶¶ 7, 9.) The face amount of the Policy, including supplementary benefits, was $1,500,000. (*Id.* ¶ 7.) The Policy lists Herman as its owner and beneficiary. (*See* Compl. Ex. A ("Policy"), Dkt. 1-1, at ECF[3] 33.)

On December 27, 2010, John Hancock received a written request, signed by Herman, purporting to assign ownership of the Policy to Defined Returns Partnership, LP ("Defined Returns"). (*See* Compl., Dkt. 1, ¶ 15; Compl. Ex. C ("Defined Returns Assignment"), Dkt. 1-3, at ECF 4.) The written request also included a change-of-beneficiary form, purporting to make Defined Returns the beneficiary of the Policy. (*See* Compl., Dkt. 1, ¶ 15; Defined Returns Assignment, Dkt. 1-3, at ECF 6.) The change-of-ownership form states that Herman transferred title to the Policy to Defined Returns in exchange for "[v]alue received." (*See* Defined Returns Assignment, Dkt. 1-3, at ECF 4.) John Hancock sent Defined Returns a letter stating that it had received and processed the change-of-ownership and change-of-beneficiary forms. (Compl., Dkt. 1, ¶ 16; Compl. Ex. D, Dkt. 1-4 (letter of receipt).)

Over the next few years, John Hancock received several other change-of-ownership and change-of-beneficiary forms for the Policy, (*see* Compl., Dkt. 1, ¶¶ 17–20), the most recent of which was dated August 13, 2013, and requested that the owner and beneficiary of the Policy be

---

[2] Unless stated otherwise, the following facts are taken from the Complaint and are undisputed. (*See generally* Brisk Answer, Dkt. 6 (admitting or denying knowledge of almost all facts asserted in the Complaint); Wilmington Savings Answer, Dkt. 15 (same).)

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

changed to Wilmington Savings. (*See id.* ¶¶ 19–20; Compl. Ex. G ("Wilmington Savings Assignment"), Dkt. 1-7.) John Hancock sent Wilmington Savings a letter stating that it had received and processed the change-of-ownership and change-of-beneficiary forms. (Compl., Dkt. 1, ¶ 20; Compl. Ex. H, Dkt. 1-8 (letter of receipt).) Since December 2013, John Hancock has "consistently received premium payments" for the Policy originating from "Christiana Bank." (Compl., Dkt. 1, ¶ 21; Compl. Ex. I, Dkt. 1-9 (premium payment history).) On a W-9 form submitted along with its change-of-ownership and change-of-beneficiary forms, Wilmington Savings had identified its "business name" as "DBA Christiana Trust (a division of WSFS Bank)." (*See* Wilmington Savings Assignment, Dkt. 1-7, at ECF 19.)

On November 7, 2018, Lilly passed away. (*See* Compl., Dkt. 1, ¶ 24; Compl. Ex. B, Dkt. 1-2 (death certificate).) On or about June 4, 2020, John Hancock sent a letter to Wilmington Savings stating that it had learned that Lilly might be deceased and that, if that was the case, Wilmington Savings should submit a life insurance claim form and Lilly's death certificate (as required by the terms of the Policy). (Compl., Dkt. 1, ¶ 22.) John Hancock did not receive the requested documents and sent additional letters to the same effect to Wilmington Savings between July and November 2020. (*Id.* ¶ 23.)

On or around May 21, 2021, John Hancock received a letter from counsel for Brisk, which asserted that Herman had assigned the Policy to the Lilly Segal Trust (the "Trust") on November 10, 2006. (*Id.* ¶ 26.) Brisk's letter stated that the Trust was therefore the owner of the Policy and that Brisk intended to submit a claim for the Policy proceeds. (*Id.*) The next month, on or about June 15, 2021, John Hancock received a second letter from counsel for Brisk requesting a response to the May 21, 2021 letter. (*Id.* ¶ 27.) Neither letter attached a copy of Lilly's death certificate. (*See id.* ¶¶ 26–27.)

The following month, on or about July 29, 2021, Brisk filed a verified petition for an order pursuant to Section 3102(c) of the New York Civil Practice Law and Rules ("CPLR") in the Supreme Court of the State of New York, Kings County, seeking pre-action discovery from, *inter alia*, John Hancock and Herman. (*See* Compl., Dkt. 1, ¶ 28.) That request was denied. (*Id.* ¶¶ 28–30.) Brisk filed an appeal but did not perfect it. (*Id.* ¶ 30.)

Then, on November 3, 2021, Brisk filed a complaint in the Supreme Court of the State of New York, Westchester County, against John Hancock and ten unnamed individual defendants, bringing claims for a declaratory judgment, breach of contract, and unjust enrichment. (*Id.* ¶ 31; Req. for Judicial Notice Ex. 1 ("State Court Compl."), Dkt. 52-2, at ECF 5–12); *see also Brisk v. John Hancock Life Ins. Co. of N.Y.*, Index No. 65959/2021 (N.Y. Sup. Ct. Westchester Cnty. June 2, 2022) (the "State Court Case").[4] On January 21, 2022, John Hancock filed a motion to dismiss Brisk's State Court complaint under CPLR Sections 3211(a)(1) and (a)(7) on the grounds that it failed to state a cause of action and the documentary evidence refuted Brisk's claims. (Compl., Dkt. 1, ¶ 32.) That motion was granted in its entirety on June 2, 2022. (*Id.*

[4] The Court takes judicial notice of the proceedings in the State Court Case, including the complaint, John Hancock's motion to dismiss, Brisk's opposition to the motion, John Hancock's reply, and the State Court's decision and order, all of which are attached to Wilmington Savings's Request for Judicial Notice, (*see* Req. for Judicial Notice, Dkt. 52-2), and also available on the public docket, *see* Doc. List, *Brisk*, No. 65959/2021, https://iapps.courts.state.ny.us/nyscef/CaseSearch (enter "65959/2021" in Case Number field; then click "Search"; and then click on case number). *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (explaining that a court "may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings" (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))); *Casler v. W. Irondequoit Sch. Dist.*, 563 F. Supp. 3d 60, 67 (W.D.N.Y. 2021) (explaining that "a district court may take judicial notice . . . of documents that . . . 'bear directly on the question of issue preclusion'" (citation modified) (quoting *Bristol v. Nassau County*, 685 F. App'x 26, 28–29 (2d Cir. 2017) (summary order))).

¶ 33.) Brisk filed an appeal, (*see id.* ¶ 34), but withdrew it on August 31, 2023, (*see* Opp'n Ex. 3 ("Stipulation Withdrawing Appeal"), Dkt. 54-4).

Meanwhile, both Wilmington Savings and Brisk submitted letters and forms to John Hancock requesting that John Hancock pay them the Policy proceeds. (*See* Compl. Ex. L, Dkt. 1-12, at ECF 5 (life insurance claim form from Wilmington Savings dated March 8, 2022); Compl. Ex. K, Dkt. 1-11 (letter from Brisk requesting payment of the Policy proceeds, including attachment purportedly showing the 2006 assignment, dated June 16, 2023).)

**III. Procedural History**

John Hancock initiated this interpleader action on August 4, 2023. (Compl., Dkt. 1.) Brisk and Wilmington Savings filed answers on August 21 and October 24, 2023,[5] respectively. (*See* Brisk's Answer, Dkt. 6; Wilmington Savings's Answer, Dkt. 15.)

On August 13, 2025, John Hancock filed a motion seeking to deposit the contested funds with the Clerk of Court, to which both Brisk and Wilmington Savings consented. (*See* Mot. for Interpleader Deposit, Dkt. 39.) The Court granted the motion and issued an order of interpleader on September 23, 2025, directing John Hancock to deposit a total of $1,341,786.15 (the "Interpleader Property," which includes both the adjusted face amount due under the life insurance policy plus contractual interest). (*See* Order of Interpleader, Dkt. 44.)[6] John Hancock

---

[5] Wilmington Savings executed a waiver of service that had been sent on September 5, 2023, (*see* Waiver of Service, Dkt. 9), so Wilmington Savings's answer was not due until November 6, 2023, *see* Fed. R. Civ. P. 12(a)(1)(A)(ii) (providing that if a defendant timely waives service, its answer is due "within 60 days after the request for a waiver was sent").

[6] The value of the Interpleader Property is lower than the initial face amount of the Policy because the face amount was reduced from $1,500,000 to $1,258,239, pursuant to the terms of the Policy and New York law, because Lilly's age had been misstated on the original Policy application. (*See* Compl., Dkt. 1, ¶¶ 7, 11–14; Policy, Dkt. 1-1, at ECF 26 § 18 (providing that, if the age of the insured "was misstated in the application," John Hancock would reduce the face amount of the benefit to what it would have been had the correct age been listed); *see also* N.Y.

made the deposit the next day. (*See* Letter, Dkt. 45.)[7] On December 10, 2025, the Court entered a consent judgment in John Hancock's favor on its claim for interpleader relief, discharging John Hancock from liability with respect to the Interpleader Property. (*See* Consent J., Dkt. 48.)

On December 30, 2025, Wilmington Savings filed a request for a pre-motion conference ("PMC") regarding its anticipated motion for judgment on the pleadings. (PMC Req., Dkt. 49.) The Court deemed a PMC unnecessary and granted Wilmington Savings leave to file the motion, (1/12/2026 Dkt. Order), which is now fully briefed, (*see* Mot., Dkt. 52; Mem., Dkt. 52-1; Opp'n, Dkt. 54; Reply, Dkt. 55).

## LEGAL STANDARD

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)). Under the Rule 12(b)(6) standard, a plaintiff's complaint should be dismissed if it does not contain "sufficient factual matter, accepted as true, to 'state a claim to

Ins. Law § 3203(a)(5) (requiring life insurance policies to include that provision). The policy application listed Lilly's date of birth as March 26, 1926. (*See* Policy, Dkt. 1-1, at ECF 32.) The Court held a bench trial in a separate case brought by Wilmington Trust, N.A. ("Wilmington Trust"), an entity distinct from Wilmington Savings, against John Hancock and Herman to determine Lilly's correct birth date. There, Wilmington Trust sought a declaratory judgment that Lilly was born on March 26, 1926. *See* Second Am. Compl. ¶¶ 27, 70–74, *Wilmington Tr., N.A. v. Segal*, No. 21-CV-1540 (PKC) (TAM) (E.D.N.Y. May 17, 2024), Dkt. No. 72. The Court found otherwise, instead holding that Lilly was born over two years earlier, on January 14, 1924. The Court accordingly entered partial final judgment in John Hancock's favor and denied Wilmington Trust's request for declaratory relief in all aspects. *See* 9/11/2026 Min. Entry, *Wilmington Tr.*, No. 21-CV-1540; Partial J., *Wilmington Tr.*, No. 21-CV-1540, Dkt. No. 133. Thus, as determined in that case, Lilly's actual date of birth was January 14, 1924. (*See* Compl., Dkt. 1, ¶¶ 24–25.)

[7] Because the Interpleader Property was deposited one day after the order of interpleader, John Hancock deposited a slightly higher sum ($1,341,822.73) to account for one additional day of contractual interest. (*See* Letter, Dkt. 45.)

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained in the complaint as true, *see Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 678), and "draw all reasonable inferences in the plaintiff's favor," *see Lively*, 6 F.4th at 301 (citation modified). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint," however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In an interpleader action, where the adverse parties are both defendants, a court applies the Rule 12(b)(6) standard "not to the complaint, but rather to [the nonmoving party's answer], which asserts a right to a portion of the interpleader stake." *See Marcus v. Dufour*, 796 F. Supp. 2d 386, 391 (E.D.N.Y. 2011) (doing the same), *aff'd sub nom. Marcus v. Haaker*, 481 F. App'x 19 (2d Cir. 2012).[8] Here, on Wilmington Savings's motion for judgment on the pleadings, the Court must therefore accept as true all well-pleaded factual allegations in Brisk's answer, (Dkt. 6), and draw all reasonable inferences from them in Brisk's favor.

**DISCUSSION**

As described above, the parties in this case have agreed that John Hancock was entitled to bring this interpleader action, the Interpleader Property has already been deposited with the Court, and John Hancock has been discharged from liability with respect to the Interpleader Property on all parties' consent. Therefore, this case is at the second step of an interpleader

[8] Because Defendants' respective answers to John Hancock's Complaint "clearly define the issues," along with their briefing for the instant motion, the Court finds it unnecessary to further require each claimant to "respond to the pleading[] of the other[]." *See* 7 *Wright & Miller's Federal Practice and Procedure* § 1715 (3d. ed. Apr. 2026).

action, in which the Court must determine which of the competing claimants, Wilmington Savings or Brisk, is entitled to the Interpleader Property.

The issue at the heart of that dispute is whether the alleged 2006 assignment to Brisk was valid and thereby supersedes the purported subsequent assignments that ended with Wilmington Savings's claim. But the issue before the Court is even narrower: did the prior State Court Case between Brisk and John Hancock answer the issue at the heart of the dispute here? Wilmington Savings argues that "Brisk's asserted claim to the [P]olicy proceeds has already been litigated and rejected" in the State Court Case. (*See* Mem., Dkt. 52-1, at 1.) Therefore, it contends that the doctrine of collateral estoppel, also known as issue preclusion, prohibits Brisk from asserting a claim to the Policy proceeds again here. (*See id.* at 7–13.) In response, Brisk argues that collateral estoppel does not apply. (*See generally* Opp'n, Dkt. 54.) For the reasons set forth below, the Court agrees with Wilmington Savings and finds that collateral estoppel bars Brisk from asserting any claim to the Policy proceeds.

## I. The Doctrine of Collateral Estoppel

The doctrine of collateral estoppel bars a party "from relitigating an issue that has already been fully and fairly litigated in a prior proceeding." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 918 (2d Cir. 2010) (emphasis omitted) (citing *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003)). "[T]he preclusive effect of a state court determination in a subsequent federal action is determined by the rules of the state where the prior action occurred." *In re Sokol*, 113 F.3d 303, 306 (2d Cir. 1997) (citing 28 U.S.C. § 1738; 18 *Wright & Miller's Federal Practice and Procedure* § 4469 (1st ed. 1980); *Allen v. McCurry,* 449 U.S. 90, 95–96 (1980)). Here, since the prior judgment is from a New York state court, the Court applies New York law to determine whether collateral estoppel applies.

Under New York law, collateral estoppel applies when two criteria are met: first, an "identical issue necessarily was decided in the prior action and is decisive of the present action"; and second, "the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 66 F.4th 365, 371 (2d Cir. 2023) (quoting *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021); and citing *In re Howard v. Stature Elec., Inc.*, 964 N.Y.S.2d 77, 79–80 (2013)).

**A. Wilmington Savings Has Established the Identity of the Issues**

First, the Court must decide whether an issue that is "decisive of the present action" was "necessarily . . . decided in the prior action." *Id.* (citations omitted). "If an issue was not actually decided in the prior proceeding, or if its resolution was not necessary to the judgment, its litigation in a subsequent proceeding is not barred by collateral estoppel." *Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) (collecting cases). "The prior decision of the issue need not have been explicit, however, if by necessary implication it is contained in that which has been explicitly decided." *Id.* (citation modified). "[T]he party seeking the benefit of collateral estoppel"—here, Wilmington Savings—"has the burden of demonstrating the identity of the issues and the necessity of their having been decided." *In re Sokol*, 113 F.3d at 306; *accord Jeffreys v. Griffin*, 769 N.Y.S.2d 184, 187 (2003). The moving party must make that showing "*with clarity and certainty*," as collateral estoppel "will apply only if it is *quite clear* that this requirement has been met." *Postlewaite*, 333 F.3d at 49 (citations omitted).

The Court finds that Wilmington Savings has met its burden of showing, with clarity and certainty, that the State Court Case resolved an identical issue and one that is determinative in this case: the validity of Brisk's claim to the Policy proceeds. The State Court Case documents provided by Wilmington Savings are conclusive of the issue. (*See generally* Req. for Judicial

Notice, Dkt. 52-2.) Brisk's complaint in that case directly asserted ownership over the Policy and its proceeds, to the exclusion of any other owner like Wilmington Savings. The asserted factual basis for Brisk's claim in the State Court Case was that Herman had assigned the Policy to Brisk in November 2006. (*See* State Court Compl., Dkt. 52-2, at ECF 6 (claiming, *inter alia*, that Herman "irrevocably transferred and assigned ownership of the Policy" to Brisk as Trustee of the Lilly Segal Trust and that Brisk "remains owner of the Policy"); *id.* at ECF 8 (claiming, *inter alia*, that "no one, other than [Brisk], is the rightful owner of the Policy," that "[a]ny purported assignment of the Policy subsequent to the November 10, 2006, assignment of the Policy by Herman Segal to [Brisk] . . . was invalid," and that Brisk "remains owner of the Policy, to the exclusion of any and all other persons that purport to claim an ownership interest in the Policy").) The relief Brisk sought in the State Court Case was a declaratory judgment "that he is the owner of the Policy, to the exclusion of any other person that claims to be the owner of the Policy," (*see id.* at ECF 9), as well as damages for John Hancock's alleged breach of contract for not paying him the Policy proceeds, (*see id.* at ECF 10), or, in the alternative, damages for unjust enrichment against John Hancock and the other purported owner of the Policy (sued as John or Jane Does 1–10) for retaining the benefit of policy premiums that Brisk purportedly paid, (*id.* at ECF 11).

The State Court dismissed Brisk's complaint in its entirety, on John Hancock's motion, after receiving and considering Brisk's opposition. (*See* Req. for Judicial Notice Ex. 5 ("State Court Decision & Order"), Dkt. 52-2, at ECF 66–70.) Judge Nancy Quinn Koba of the Supreme Court of the State of New York, County of Westchester, held that the Policy itself "flatly contradicts (and utterly refutes Brisk's allegations, conclusively establishing a defense to) the bare legal conclusions alleged in the complaint." (*Id.* at ECF 69.) She found that "[n]owhere in

the Policy is either Brisk or the Trust listed as an owner or beneficiary" of the Policy. (*Id.*) She then noted that if the Policy had been subsequently assigned, its terms provided that John Hancock would "not be on notice of any assignment unless it is in writing," nor would John Hancock "be on notice until a duplicate of the original assignment [was] filed at [John Hancock's] Service Office." (*Id.* (quoting Policy, Dkt. 1-1, at ECF 26 § 17).) Judge Quinn Koba observed that John Hancock "never received any purported assignment" to Brisk, and, perhaps more importantly, "Brisk neither alleged that the purported assignment had been furnished to [John] Hancock nor attempted to remedy any defects in the complaint by producing the purported assignment in response to [John Hancock's] Motion." (*Id.*) Therefore, Judge Quinn Koba concluded, "Brisk failed to show that he has any rights in the Policy." (*Id.*)

Here, as noted above, the issue at the heart of the dispute is whether Wilmington Savings or Brisk is entitled to the Policy proceeds, and more specifically, whether Herman validly assigned the Policy to Brisk in November 2006. As to Brisk, that issue was clearly raised and actually decided in the State Court Case. *See* Restatement (Second) of Judgments § 27 cmt. d (A.L.I. 1982) ("When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated [for purposes of issue preclusion]. An issue may be submitted and determined on a motion to dismiss for failure to state a claim . . . . A determination may be based on a failure of pleading or of proof . . . ."); *accord D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 667 (1990). Wilmington Savings has therefore met its burden of showing that the first requirement of collateral estoppel is satisfied.

Brisk's attempt to distinguish the State Court Case is unpersuasive. He contends that the issues raised in the State Court Case differ from the issues raised in this case because while the

State Court Case "concerned ownership of the [P]olicy," it "never determined whether Brisk could equitably receive any of the life insurance proceeds in an interpleader action." (Opp'n, Dkt. 54, at 3; *see also id.* at 5 ("[T]he State Court [C]ase involved a claim of ownership of the life insurance policy, while this interpleader action involves rights to interpleaded funds[]."').) But Brisk's claim to the Policy proceeds in this case rests entirely on his argument that *he is the owner of the Policy*. In his answer, he admits that his claim to the Policy proceeds is based on his assertion that "the Trust [is] the owner of the Policy," (Compl., Dkt. 1, ¶ 26). (*See* Brisk Answer, Dkt. 6, ¶ 26 (admitting allegations in paragraph 26 of the Complaint); *see also* Compl. Ex. K, Dkt. 1-11, at ECF 1, 3 (letter from Brisk to John Hancock requesting payment of the Policy proceeds because "he is the owner of [the] Policy . . . by virtue of the fact that the policy was sold and assigned to him in 2006" and asking for confirmation that John Hancock will either pay Brisk the Policy proceeds or "commenc[e] an interpleader action *to determine ownership of the Policy*" (emphasis added)).) Similarly, Brisk's affirmative claims to the Policy proceeds, styled as affirmative defenses in his answer, are all entirely based on his claim of ownership. (*See* Brisk Answer, Dkt. 6, at 5–6 (claiming entitlement to the Policy proceeds on grounds that Brisk "is a bona fide purchaser" and "assignee" of the Policy "to the exclusion of any other person or entity," and that his assignment "has priority over all subsequent purported assignments of the Policy," notwithstanding his "alleged failure . . . to notify John Hancock . . . of the assignment").) Indeed, Brisk's own opposition brief reaffirms that his interest in the Policy proceeds is based solely on his argument that he was "assigned ownership of the [P]olicy," that he is "the first bona fide purchase[r] and assignee of the [P]olicy," and that he "has priority over all subsequent purported assignees." (*See* Opp'n, Dkt. 54, at 7.) Thus, based on Brisk's own pleading and briefing, if he has no ownership right in the Policy, his claim

to the Policy proceeds fails. That is why the issue that was decided in the State Court Case, (*see* State Court Decision & Order, Dkt. 52-2, at ECF 69 ("Brisk failed to show that he has any rights in the Policy.")), is both decisive of and identical to the issue presented here.[9]

The lone case Brisk cites in support of his argument is distinguishable. (*See* Opp'n, Dkt. 54, at 4–5 (discussing *Fed. Ins. Co. v. PixarBio Corp.*, No. 20-CV-4659 (GBD), 2022 WL 623735 (S.D.N.Y. Mar. 3, 2022), *aff'd sub nom. Fed. Ins. Co. v. Mintz*, No. 22-705, 2023 WL 3450502 (2d Cir. May 15, 2023)).) In that interpleader case, an insurance company issued a liability insurance policy to a company, PixarBio Corporation ("PixarBio"), to cover the costs of PixarBio's legal representation. *See PixarBio*, 2022 WL 623735, at *2. A law firm that had represented PixarBio later sued the insurance company in state court, seeking a share of the policy proceeds to "recover its legal fees" under the policy. *See id.* at *5 (quoting *Mintz Fraade Law Firm, P.C. v. Fed. Ins. Co.*, 147 N.Y.S.3d 29, 30 (1st Dep't 2021)). The state court dismissed the action, holding that the law firm did not have standing to sue the insurance company, but rather that the law firm's recourse would be against PixarBio, its client. *See id.* (citing *Mintz Fraade*, 147 N.Y.S.3d at 30). In the subsequent interpleader action in federal court, in which both PixarBio and the law firm were interpleaded defendants, the district court held that the state court decision did not collaterally estop the law firm from asserting its claim to the policy proceeds against PixarBio. *See id.*

That holding, which made sense in *PixarBio*, does not apply here because the issue that the state court decided in *PixarBio* was *not* the same issue presented in the subsequent federal

[9] And Brisk's argument (discussed *infra*) that he withdrew his appeal of the State Court Case because this action would give him the opportunity to "establish his right to the life insurance proceeds," (Opp'n, Dkt. 54, at 5–6), also effectively concedes that the issues presented in the two cases are identical.

interpleader action. The issue that the state court decided in *PixarBio* was not whether the law firm was entitled to the insurance policy proceeds to the exclusion of any other party, but whether the law firm had standing to bring a cause of action against the insurance company directly. Though it found that the law firm lacked standing to sue the insurance company, the state court expressly contemplated and left open the possibility that the law firm could assert its claim against PixarBio, *see id.* (explaining that the state court held that the law firm's "sole recourse was against the insured, its client, and not its client's insurance provider" (quoting *Mintz Fraade*, 147 N.Y.S.3d at 30)), which is what happened in the federal interpleader action. Once PixarBio and the law firm were adverse parties in the interpleader action, the state court decision did not bar the law firm's claim to the proceeds. By contrast, here, the issue decided in the State Court Case is exactly the same issue presented in this interpleader case: whether Brisk had a right to the Policy proceeds to the exclusion of any other party. The State Court decision, which found that Brisk had no such claim, thus collaterally estops him from making the same claim here. Brisk's attempt to analogize *PixarBio* to this case therefore fails.[10]

**B. Brisk Had a Full and Fair Opportunity to Litigate the Issue**

Once the party seeking to invoke collateral estoppel has shown that an identical issue was previously decided, the other party—here, Brisk—"has the responsive burden of establishing the absence of a full and fair opportunity to litigate the issue in the prior action." *In re Sokol*, 113 F.3d at 306 (applying New York law); *accord Jeffreys*, 769 N.Y.S.2d at 187. "In determining

[10] To further illustrate the difference between the two cases, *PixarBio* would be on point if the law firm had argued in its state court action that it was actually the party directly insured by the liability insurance policy (not PixarBio) and that it was therefore exclusively entitled to the insurance policy proceeds. Had the state court rejected that argument, collateral estoppel would have barred the law firm from making the same argument in federal court when vying for the policy proceeds against PixarBio as interpleader defendants. But that was *not* the factual scenario in *PixarBio*, which is why that case has no relevance here.

whether a party has had a full and fair opportunity to litigate, a court must be mindful of the realities of the litigation," *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996) (citing *People v. Roselle*, 618 N.Y.S.2d 753, 756 (1994)), including "the context and other circumstances which may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him," *Ryan v. N.Y. Tel. Co.*, 478 N.Y.S.2d 823, 827 (1984) (citation modified). Among the factors to be considered are the "nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law[,] and the foreseeability of future litigation." *Id.*

Brisk has failed to show that he lacked a full and fair opportunity to litigate the State Court Case. Brisk himself initiated the State Court Case in his forum of choice, and he had every incentive to litigate the issue of his ownership over and claim to the Policy proceeds, which were directly at issue in that case. He extensively briefed his opposition to John Hancock's motion to dismiss, in which he made many of the same arguments he makes here. (*Compare* Req. for Judicial Notice Ex. 3 ("Brisk State Court Opp'n"), Dkt. 52-2, at ECF 33, 41–44 (arguing that Brisk has priority of right as the initial assignee, and that *Rose v. AmSouth Bank*, 391 F.3d 63 (2d Cir. 2004), shows that lack of notice to the insurer does not affect the priority of the assignments or estop the valid assignee from claiming the proceeds), *with* Opp'n, Dkt. 54, at 7–8 (making the same argument and again citing *Rose*, 391 F.3d 63).) He was represented in the State Court Case by the same counsel that represents him here. (*Compare* State Court Compl., Dkt. 52-2, at ECF 12 (signed by attorney Samuel Karpel), *and* Brisk State Court Opp'n, Dkt. 52-2, at ECF 53 (same), *with* Opp'n, Dkt. 54, at 8 (same).) Brisk points to no new evidence that has become

available after the State Court Case that would have changed the outcome, nor does he point to any differences in the applicable law.

Rather, Brisk's sole argument for the proposition that he did not have a full and fair opportunity to litigate the prior action is based on the foreseeability of future litigation. He argues that the "realities of the litigation" show that Brisk withdrew his appeal of the State Court Case because "John Hancock commenced this interpleader action, which provided a venue for Brisk to establish his right to the life insurance proceeds, [so] there was no need to spend time and effort . . . addressing the appeal." (Opp'n, Dkt. 54, at 5–6.) Therefore, he contends, he "did not have the full opportunity to litigate the State Court action." (*Id.* at 6.) But Brisk's decision to withdraw his appeal does not negate the fact that he had ample *opportunity* to litigate the issue. Brisk supplies no case law, and the Court is not aware of any, supporting his claim that he was denied a full and fair opportunity to litigate the State Court Case because he strategically and voluntarily withdrew his appeal. (*See generally id.* at 5–6.)

Indeed, if anything, Brisk had a full and fair opportunity to litigate the issue not only before the State Court, but also through the appellate process he initiated. The Court agrees with Wilmington Savings that Brisk's "failure to take full advantage of the opportunity he had" at the appellate level "does not mean he lacked one." (Reply, Dkt. 55, at 7); *see also, e.g.*, *Tinnell v. Invacare Corp.*, 819 F. Supp. 2d 192, 197 (W.D.N.Y. 2011) (holding that a party had a "full and fair opportunity" to litigate the issue before state court, for purposes of collateral estoppel, where the party could have appealed the state court's adverse decision but failed to do so); *Monaco v. Hogan*, No. 98-CV-3386 (NGG) (RML), 2016 WL 1322431, at *7 (E.D.N.Y. Mar. 31, 2016) (holding that a party "who makes a strategic decision to forego an appeal still had a full and fair opportunity to litigate"), *aff'd sub nom. Monaco v. Sullivan*, 737 F. App'x 6 (2d Cir. 2018).

### C. Other Equitable Considerations Favor Applying Collateral Estoppel

Finally, Brisk notes that "collateral estoppel is an equitable doctrine," and argues that "notions of fairness and justice should compel the [C]ourt to deny" Wilmington Savings's motion. (Opp'n, Dkt. 54, at 6–7 (citation omitted).) He argues that applying collateral estoppel would be unfair here for two reasons: (1) "[b]ut for John Hancock commencing this interpleader action, Brisk would not have withdrawn the State Court appeal, in which the anticipation was that the Appellate Division would have reversed the State Court's decision"; and (2) because Brisk "has a strong claim to the life insurance proceeds." (*Id.* at 7.) The Court strongly disagrees.

Brisk's first argument is utterly unpersuasive. If Brisk was confident that he would have won his appeal, his decision to voluntarily withdraw it was unwise. But Brisk's own "strategic miscalculations do not generate unfairness." *See Phoenix Light*, 66 F.4th at 373. What *would* be unfair is to allow Brisk a second bite at the apple in this forum based solely on his representation that he mistakenly thought collateral estoppel would not bar his claims here.

Brisk's second argument is equally unavailing. As noted previously, Brisk raises virtually identical arguments to those he made in the State Court Case and argues, in effect, that the State Court Case was wrongly decided. But even assuming that the Court disagreed with the State Court Case (which it does not), the doctrine of collateral estoppel "represents an informed [judicial] choice that the occasional permanent encapsulation of a wrong result is a price worth paying to promote the worthy goals of ending disputes and avoiding repetitive litigation." *Johnson*, 101 F.3d at 795 (citing *People v. Berkowitz*, 428 N.Y.S.2d 927, 933–34 (1980)); *see also* Restatement (Second) of Judgments § 28 cmt. j (A.L.I. 1982) ("[A] refusal to give the first judgment preclusive effect should not . . . be based simply on a conclusion that the first

determination was patently erroneous."). The Court finds no reason, equitable or otherwise, to allow Brisk to re-litigate his claim to the Policy proceeds in this forum.

Additionally, the Court is compelled to highlight what appears to be emerging as a disturbing pattern of litigation related to life insurance policies taken out by Herman and/or his associates. For context, around the time Herman took out the Policy on Lilly's life, he was operating a business called "Signature Capital." *See John Hancock Life Ins. Co. of N.Y. v. Solomon Baum Irrevocable Fam. Life Ins. Tr.*, 357 F. Supp. 3d 209, 212 (E.D.N.Y. 2018) (describing undisputed facts on summary judgment and relying on Herman's deposition testimony), *aff'd*, 783 F. App'x 89 (2d Cir. 2019); *Lincoln Nat'l Life Ins. Co. v. Inzlicht-Sprei*, No. 16-CV-5171 (PKC) (RML), 2020 WL 1536346, at *1–6 (E.D.N.Y. Mar. 31, 2020) (same), *aff'd*, 847 F. App'x 97 (2d Cir. 2021). Signature Capital's business model involved obtaining life insurance policies for elderly people "with their agreement and participation, enlisting investors or [outside] financing entities to pay [the] premiums, and selling the policies after two years," which was the typical period during which the policy could be contested, under the policy's terms. *See Solomon Baum*, 357 F. Supp. 3d at 212–13; *accord Inzlicht-Sprei*, 2020 WL 1536346, at *1. Because Herman understood that "an insurer, such as John Hancock, would not issue policies to applicants who disclosed an intent to secure premium financing," Signature Capital and the families set up trusts that would nominally "own the policy" for the first few years, with one of the elderly person's family members designated as the trust's beneficiary. *Solomon Baum*, 357 F. Supp. 3d at 212–13. Signature Capital would pay the policy premiums, but would route the money through the trust first in order to conceal Signature Capital's involvement. *See id.* at 213. Once the two-year contestability period ended and Signature Capital sold the policy to another financial entity, the elderly person and/or their family would

receive a share of the sale proceeds (or some other agreed-upon payout) without ever having to pay premiums themselves. *See id.*

In both *Solomon Baum* and *Inzlicht-Sprei*, however, when the insured elderly person died years later, the trusts and/or trust beneficiaries tried to claim the entire policy proceeds by contesting the validity of the policy's sale, despite the fact that selling the policy was, according to Herman, the plan all along, and despite the fact that the purchaser had been paying the premiums. In *Inzlicht-Sprei*, Herman even helped the family member submit his claim to the policy proceeds. *See* 2020 WL 1536346 at *6. The Court in that case remarked that it was "troubled" by the family member's assertion that he would be entitled to the policy proceeds given that he had "not paid a single cent" towards the policy's premiums. *Id.* at *16 n.32. In any event, in both *Solomon Baum* and *Inzlicht-Sprei*, the courts rejected the trusts' and/or family members' claims to the proceeds and issued judgment in favor of the subsequent purchasers. *Id.* at *20; *Solomon Baum*, 357 F. Supp. 3d at 221.

The facts of this case are suspiciously similar to the facts in these other cases, and the Court finds it similarly troubling. For reasons unclear to the Court, the Trust instrument that Brisk submitted to John Hancock as purported proof of the 2006 assignment has been redacted to remove any information about the identity of the Trust's beneficiary. (*See* Compl. Ex. K, Dkt. 1-11, at ECF 9–10.) The Court notes that Herman himself has been at least one of the beneficiaries of other trust(s) similarly established using Lilly's name and life insurance policies. *See, e.g.*, Second Am. Compl. Ex. C at ECF 30, 34, *Wilmington Tr., N.A. v. Segal*, No. 21-CV-1540 (PKC) (TAM) (E.D.N.Y. May 17, 2024), Dkt. No. 72-1 (copy of agreement, signed by Herman, stating that Herman was beneficiary of other "Lilly Segal Family Trust[s]" related to separate life insurance policies on Lilly's life). Thus, it is certainly possible, and perhaps even

plausible, that Herman (1) sold the Policy to a third-party purchaser, Defined Returns, in exchange for money (either before or after the purported assignment to the Trust); (2) allowed the purchaser and subsequent assignees, including Wilmington Savings, to pay the Policy premiums for years; and (3) now, through Brisk, seeks the full Policy proceeds—essentially seeking to get paid twice, for both the initial sale of the Policy and also for the Policy proceeds as if the sale never occurred.[11] Although the Court ultimately does not need to determine whether this suspicion is correct in order to dispose of this case on collateral estoppel grounds, the Court makes note of its concern for the record and for any similar cases that might arise in this District or elsewhere in the future. The Court also emphasizes that if, in fact, Herman is a beneficiary of the Trust, equitable considerations would further *strongly* militate against granting Brisk's request for interpleader relief. The Court warns Herman and his associates that the Court will not countenance being used as an instrument in any fraud scheme and that sanctions could result in any such future effort.

[11] This suspicion is further bolstered by Herman's own trial testimony in the bench trial before the Court in the case *Wilmington Trust v. Segal*, discussed *supra* at n.6. There, Herman admitted that he had taken out two life insurance policies on Lilly's life (different from the Policy at issue here), sold them, and knowingly took steps to make it difficult for the purchaser to collect on the policies after Lilly's death. *See* 9/09/2025 Trial Tr. 60–79, *Wilmington Tr.*, No. 21-CV-1540, Dkt. No. 138. Those steps included falsifying Lilly's date of birth, social security number, and address on the policy applications, and even legally changing Lilly's name after submitting the applications to make it difficult for the purchaser to learn about and prove her death to the life insurance company. *See id.* At least part of Herman's scheme was apparently to try to force the purchaser to pay him a significant sum of money (i.e., a million dollars) in exchange for information that would allow the purchaser to collect on the policies. *See id.* at 86–90. Given Herman's unapologetic and brazen admission that he had engaged in a fraudulent life-insurance scheme for his own financial benefit, the Court does not assume or trust that he has not done the same here.

**CONCLUSION**

For the reasons stated above, Wilmington Savings's motion for judgment on the pleadings is GRANTED. The Clerk of Court is respectfully directed to release and disburse the Interpleader Property, with interest, to Wilmington Savings, enter judgment accordingly, and close this case. The Court directs John Hancock to file a letter on the docket by October 7, 2026 stating whether it intends to seek an award of attorneys' fees and costs.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 29, 2026
Brooklyn, New York